## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

GARY METCALF,                                  )
                                               )
            Plaintiff,                         )
v.                                             )          No.  05-CV-120-TCK -FHM
                                               )
 THE CITY OF GROVE, OKLAHOMA, BILL   )
GALLETLY, DEBBIE MAVITY, RANDY                 )
JOBE, DAVID ADZIGAN, DAVID HELMS,              )
AND CAROLYN NUCKOLLS,                          )
                                               )
            Defendants.                        )

## ORDER

Before the Court are Defendants' Motion for Summary Judgment (Docket No. 29) and

Plaintiff's Motion for Partial Summary Judgment (Docket No. 31).

**I.      Facts**

*The Parties*

Plaintiff Gary Metcalf ("Metcalf") was hired by Defendant the City of Grove (the "City")

as director of emergency management on July 1, 1995.  Plaintiff remained in this position until he

was terminated in 2004.  Defendant William A. Galletly ("Galletly") was the City Manager of Grove

at all relevant times.   Defendant Debbie Mativy ("Mativy") was the Assistant City Manager of

Grove at all relevant times.  Defendants Randy Jobe ("Jobe"), David Adzigan ("Adzigan"), David

Helms ("Helms"), and Carolyn Nuckolls ("Nuckolls") were members of the City Council of the City

of Grove ("Grove City Council") at all relevant times.  All individual Defendants are named in their

individual and official capacities.  It is undisputed that all individual Defendants were acting within

the scope of employment at all relevant times.  (Compl. ¶¶ 5-7.)

1

*The Pornography Investigation*

On May 20, 2004, Galletly placed Metcalf on a seven-day paid administrative leave for "insubordination" after Metcalf issued a memorandum regarding a change in the City's emergency services response policy that was not authorized by Galletly.  (*See* Def.'s Ex. D.)  Metcalf disputed that the memorandum was unauthorized but did not challenge the administrative decision to place him on leave.  (*See* Def.'s Ex. E.)

While Metcalf was on administrative leave, Galletly asked Mativy to hire a computer technician to examine certain computers, including the computers in Metcalf's office.  (*See* Def.'s Ex. J at D.76.)[1]  According to a written statement by Mativy completed on May 27, 2004 for the Grove Police Department, she and a computer technician with RECtec Technology & Communications ("RECtec"), an independent company, examined two computers in Metcalf's office.  On one of the computers, the RECtec employee found certain adult pornographic material, and Mativy determined that the computer should be seized.  The RECtec employee took the computer to his office for further examination. (*See* Def.'s Ex. F at D.35-36.)  There was one other computer, located in the Grove Civic Center, containing pornographic material that was seized the same date.  Mativy told Galletly what she had found on the computers, and Galletly told her to contact the Grove Police Department.  The two computers were turned over to the Grove Police Department for investigation.

---

[1]  The news reports, described in detail below, indicate that Galletly requested an investigation of these computers based on a tip from an employee that certain computers had been misused.  A police report in the record indicates that Galletly told a police officer that he initially targeted Metcalf's computer because he believed Metcalf was using the city computer after hours to buy and sell items on e-bay.  (*See* Plf.'s Reply to Def.'s Resp. to Mot. for Partial Summ. J. at Ex. 7.)

On May 28, 2004, Metcalf visited the RECtec office and spoke with certain employees regarding the computers, including Sheila Allgood ("Allgood").  According to a letter written by Allgood dated June 17, 2004, Metcalf told her to be careful who RECtec sided with and that it would be wise to "turn [their] head on some things."  (*See* Def.'s Ex. H.)  Metcalf denies making any threatening statements to Allgood.  (Metcalf Dep., Def.'s Ex. AA at 159:2-6.)

*Publicity Prior to Metcalf's Termination - June 2-17, 2004*

On June 2, 2004, there was released an "ONR Rundown"[2] stating:

> Grove Police have seized two computers from city departments to investigate claims that adult and child pornography was viewed on the computers.  City Manager Bill Galletly and police say any criminal investigation could take several weeks and they'll focus on the child porn allegation.  The City won't name the departments or personnel who may be involved until the investigation is over.

(Def.'s Ex. O.)  On June 3, 2004, the story broke on an Internet web site, NewsOK.com.  This article stated:

> Two city computers recently were seized after allegations that one was used to access a child pornography Web site.  Grove Police Chief Mark Wall said Wednesday the computers, which were used in the Emergency Management Services and the Grove Civic Center departments, were removed last week and sent to the Oklahoma State Bureau of Investigations. . . . City Manager Bill Galletly said Wednesday someone using one computer allegedly visited pornographic Web sites, and someone using the other computer possibly viewed porn sites involving minors.  The investigation was prompted by a tip from a staff member that one or more computers may have been used in violation of the City's internet policy, Galletly said.

(Def.'s Ex. P.)  On June 4, 2004, the story broke in a Missouri newspaper, *The Joplin Globe*.  In addition to the information previously reported, this paper stated:

> Galletly said the pornography allegations surfaced after the city distributed a formal

---

[2]  It is unclear exactly what this document is or to whom it was published.  The author, however, had apparently spoken with Galletly and the police department.

internet-use policy to its employees. . . . After the policy was distributed, a city employee called his office "and said we ought to look at the computer files in two specific offices," he said.

(Def.'s Ex. Q.)[3]

On June 14, 2004, the Grove Police Department issued a news release stating that no child pornography had been found on either of the two City computers seized, that there was no crime involved, and that any action taken from that point would be an administrative matter to be handled by the City Manager.  (*See* Def.'s Ex. I.)

On June 16, 2004, the story broke in *The Tulsa World*.  The article reported that no criminal activity was involved but that Galletly stated that "'it was verified that adult pornography was viewed on both computers.'" Galletly was further quoted as stating that it "'becomes an administrative issue at this point . . . [and] [w]e are reviewing the situation and, if warranted, we will take action on this matter.'"  (*See* Def.'s Ex. S.)

On June 17, 2004, *The Miami News-Record* ran a similar article, which was entitled "City of Grove Continues Probe Into Computer Pornography Issue." The article reported that Galletly had stated that substantial amounts of adult pornography were found, that he had been provided with a

---

[3]  A Grove Police Report, dated June 7, 2004, is also in the record.  (*See* Plf.'s Reply to Def.'s Resp. to Mot. for Partial Summ. J. at Ex. 7.)  This report was completed by Officer Mark Sheridan and states that on May 27, 2004, "Galletly told me he believed Metcalf was using the city computer after hours to buy and sell items on E-bay.  Galletly told me he was told by Mativy some pornographic pictures were found on Metcalf's computer hard drive."  The report states that the history on Metcalf's computer indicated that approximately thirty photos of naked adult females had been viewed between May 8 and May 16, 2004.  According to Plaintiff, this report "is a public record accessible to anyone who asks for it."  However, the top of the report is marked "sealed."  There is no other evidence in the record to indicate whether and under what circumstances this report was made available to the public, and the Court therefore does not consider it as a relevant "publication" for purposes of this motion.

list of web sites visited, and that "his office is currently reviewing the information received before making a decision on the matter." (*See* Def.'s Ex. T.) Also on June 17, 2004, *The Grove Sun* ran an article on its web site containing similar information as that previously reported. It further reported:

> Despite the investigation showing that no child porn photos were on the hard drives of the computers, when asked if the computers had been used to visit pornographic web sites Galletly answered, "Yes, without a doubt." Galletly explained that the computer technicians were able to examine the internet history of both computers and provide the investigators with detailed lists of the web sites visited by those computers . . . . "With the information on these lists, we know the visits are deliberate and not just 'pop-up' ads," said Galletly. . . . Further details released *from the investigation* included that one computer was in use at the Grove Civic Center, and the other at the Grove Emergency Management Department. Galletly stated that although one of the two computers was password protected and only accessible by one person, the other would be harder to narrow down as several people had access and the computer was kept in an open area."

(Def.'s Ex. U (emphasis added).)

*Metcalf's Termination - June 18, 2004*

On June 18, 2004, the day following Galletly's statements regarding his conclusion that the computers had undoubtedly been used to visit pornographic web sites, Metcalf met with Galletly and Mavity. The meeting was recorded by Metcalf on audio tape, and a transcript of the tape is part of the record in this case. (*See* Def.'s Ex. J.) Galletly stated that he called the meeting to make Metcalf aware of "what we have done and what we have found and the conclusion it has led me to." (*Id.* at D.75.) The issues discussed at the meeting were Metcalf's alleged improper use of the computer to access pornographic web sites and alleged threatening statements made to technicians at RECTec if they did not "look the other way" regarding the material found. (*Id.* at D.85.) During the meeting, Galletly stated: "This situation involves a computer in your possession going to inappropriate sites, adult pornographic sites. This involves your action or reaction to a call

regarding the same, i.e., password, and then the action you took from there was to go to a private company and make statements and insinuations . . . ." (*Id.* at D.89.)  During the meeting, Galletly did not raise the issue of the administrative leave occurring in May or any other performance-related issues.  At the conclusion of the meeting, Galletly stated that Metcalf had said nothing to change his mind and that he believed Metcalf used the computer inappropriately.  (*Id.* at D.85.)  He then gave Metcalf the option of resigning or being terminated, and Metcalf refused to resign before speaking with his attorney.  (*Id.* at D.86-87.)  Galletly therefore terminated Metcalf and provided Metcalf with a letter stating that Metcalf's employment was being "terminated for the good of the service, effective immediately."  (Def.'s Ex. K.)

Later that day, on June 18, 2004, Metcalf requested a "Board of Inquiry" hearing in response to his termination.  On June 22, 2004, Galletly responded by letter notifying Metcalf that the personnel manual did not provide for such a hearing but that Metcalf could appeal his termination back to Galletly.  Metcalf did not file an appeal.  (*See* Def.'s Exs. L and M.)  Also on June 18, 2004, Metcalf's attorney Winston Connor ("Connor") requested a "full evidentiary name-clearing hearing before a fair and impartial board, panel or individual that was not associated with the decision to terminate him." (*See* Plf.'s Ex. 4.)  The City did not respond to this letter and did not provide Metcalf with a "name-clearing" hearing.  Plaintiff also sent letters to all members of the Grove City Council, including Defendants Jobe, Adzigan, Helms, and Nuckolls (the "City Council Defendants"), requesting a name-clearing hearing.  (*See* Metcalf Dep., Def.'s Ex. AA at 142:11-16.)  The City Council Defendants failed to take any action on the request.

*Publicity After Metcalf's Termination - June 22-23, 2004*

On June 22, 2004, two news stations broadcasted reports that Metcalf had been fired after a city computer was used to visit pornographic web sites.  A Tulsa, Oklahoma news station reported:

> A Grove emergency services director has lost his job after officials found a city computer was apparently used to visit pornographic Web sites.  An attorney for Gary Metcalf says Metcalf was fired on Friday.  Attorney Winston Connor says Metcalf denies accessing inappropriate material on the Internet. . . .

(Def.'s Ex. V.)  A Pittsburg, Kansas television station reported:

> Police in Grove, Oklahoma, seized computers earlier this month that were used by city employees. . . . Gary Metcalf, the City Emergency Services Director, was fired on Friday after an investigation.  Metcalf's lawyer says his client did not visit any Internet site with adult material on it.

(Plf.'s Ex. 3 at 199.)  Neither of these broadcasts quotes or references Galletly or any other City official.  The next day, on June 23, 2004, *The Joplin Globe* ran the most thorough article to date, which was entitled, "Grove City Employee Fired":

> Gary Metcalf, director of Grove's emergency management department, has been fired after pornographic Web sites allegedly were discovered on a city computer. Metcalf, a city employee for almost nine years, hired Miami lawyer Winston Connor to represent him and act as his spokesman.  Connor on Monday said Metcalf will request that the city hold a due process hearing on his firing. . . .  Connor said, "Depending on what is on the Web site, it may come under the free- speech clause under the First Amendment."  Galletly took issue with that comment, saying, *"Pornography is protected as free speech on a home computer but not a computer at work."*  Galletly denied additional comment, saying, *"It's an internal personnel matter."*

(Def.'s Ex. W (emphasis added).)  Also on June 23, 2004, a Joplin, Missouri news station broadcast the following story:

> Gary Metcalf, Director of the Grove Emergency Operation Services, was fired on Friday.  A computer was seized from the department last month after an employee alleged it was used to access pornographic web sites.  After a police investigation, City Manager Bill Galletly determined the web sites were pornographic.  City officials say they were in the process of putting a computer policy in place when the allegations surfaced. . . .

7

(Plf.'s Ex. 3 at 55.)  The above-referenced publications are a conclusive list of publications that occurred immediately following Metcalf's termination.

*The Financial Investigation and Ensuing Publicity - August 4-5, 2004*

Sometime after Metcalf's termination, an independent auditing firm performed an audit of Metcalf's former department, which allegedly showed unrecorded grant expenditures, misuse of city equipment, and misuse of inventory items by Metcalf.[4]  Galletly then asked the Grove Police Department to investigate possible misappropriation of equipment and funds in the City's emergency services department.  This precipitated a second round of publicity, which not only reported the financial investigation of Metcalf's activities but also re-reported the pornography investigation and termination of Metcalf.  On August 4, 2004, *The Miami News-Record* ran an article entitled, "Grove City Manager Wants Investigation."  This article reported:

> The Grove city manager advised the city council that he has formally requested a police investigation into matters concerning the former director of emergency management services.  Bill Galletly presented the city council with findings of an internal audit during the council's regular meeting Tuesday. . . . Gary Metcalf, director of the city's EMS program, was fired last month after a police department investigation revealed pornographic material on a city-owned computer in the EMS office.

The rest of the article details the findings of Galletly and the internal auditors regarding possible misuse of equipment and funds.

On August 5, 2005, *The Tulsa World* ran a similar article entitled "Grove Police to

 Investigate Irregularities in EMS Fund."  This article primarily reported on the alleged misuse of funds but also mentioned Metcalf's termination:

---

[4]  These allegations relate, at least in part, to Metcalf's use of City equipment to buy and sell items on e-bay for his personal benefit, which Metcalf claims was authorized by Galletly. (Metcalf Dep., Plf.'s Ex. 1 at 99:12-100:9.)

8

> City Manager Bill Galletly told city councilors Tuesday night that he asked for the
> investigation after an audit . . .  showed unrecorded grant expenditures, misuse of
> city equipment and/or facilities, and misuse of inventory items.  *Last month, city*
> *officials fired emergency services chief Gary M. Metcalf after they said adult*
> *pornography was found on his computer at work.*  Authorities at first had
> investigated whether the computers had child pornography, but that was not the case,
> they said.

(Def.'s Ex. Y (emphasis added).)  *The Joplin Globe* also ran a similar story regarding the improper

use of city equipment.  At the conclusion of the article, it states that "Metcalf, a city employee for

almost nine years, was fired in June after adult pornographic Web sites reportedly were discovered

on a city computer used in the emergency management department."  (Def.'s Ex. Z.)  Finally, a

Joplin news station reported that a former city official was under investigation for misuse of city

equipment and stated that "Metcalf was fired in June after a computer in his department was used

to access pornographic web sites."  (Plf.'s Ex. 3 at 54.)

*Lawsuit Filed - March 2, 2005*

Approximately seven months later, on March 2, 2005, Metcalf filed the Complaint herein,

alleging that Defendants"deprived Mr. Metcalf of his right to Liberty without Due Process of law

by terminating him based upon public statements of unfounded charges of dishonesty and

immorality that have seriously damaged Mr. Metcalf's standing and associations in the community

and foreclosed his freedom to take advantage of future employment opportunities." (Compl. ¶ 29.)

Metcalf requests actual and punitive damages and any other legal or equitable relief deemed

appropriate by the Court, including reinstatement to his former employment and a Court-ordered

notice from the defendants advising the public that the charges made against him were false.

Metcalf does not seek a name-clearing hearing as equitable relief because he states that a meaningful

hearing is no longer possible and will not undo the harm suffered as a result of the failure to provide

such a hearing at the appropriate time.  Metcalf has also asserted state tort claims arising from his termination.

## II.      Constitutional Claim - Deprivation of Liberty Without Due Process of Law

Metcalf alleges that the circumstances surrounding his termination resulted in a deprivation of his liberty without due process of law, in violation of the Fourteenth Amendment to the United States Constitution.  Metcalf's claim is made pursuant to 42 U.S.C. § 1983.  In the context of public employment, the United States Supreme Court has held that a liberty interest may arise when a person's "good name, reputation, honor, or integrity" is at stake. *See Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 573 (1972).  Interpreting *Roth* and its progeny, the Tenth Circuit has stated:

> Putting these cases together, we can construct the parameters of a liberty interest case involving the discharge of a public employee.  When a public employee takes action to terminate an employee based upon a public statement of unfounded charges of dishonesty or immorality that might seriously damage the employee's standing or associations in the community and foreclose the employee's freedom to take advantage of future employment opportunities, a claim for relief is created.

*Melton v. City of Oklahoma City*, 928 F.2d 920, 927 (10th Cir. 1991).  Tenth Circuit cases subsequent to *Melton* have interpreted this statement in *Melton* to create a four-part test:

> In order to demonstrate the infringement of a liberty interest in one's good name, one must show that: (1) the defendant made a statement impugning his or her good name, reputation, honor, or integrity; (2) the statement was false; (3) the defendant made the statement in the course of termination proceedings *or* the statement foreclosed future employment opportunities;[5] and (4) the statement was published.

---

[5]  Both parties cited cases utilizing this element of the test.  However, since these cases were decided, the Tenth Circuit has questioned whether foreclosure of opportunity, standing alone, is sufficient and therefore questioned the disjunctive "or" in the third element of the test. *See Stidham v. Peace Officer Standards and Training*, 265 F.3d 1144, 1154 (10th Cir. 2001) (holding that Supreme Court's decision in *United States v. Siegert*, 500 U.S. 226 (1991), compelled it to conclude that a plaintiff must be terminated incident to the alleged defamation

*Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 526 (10th Cir. 1998) (emphasis added); *Workman v. Jordan*, 32 F.3d 475, 481 (10th Cir. 1994). If a plaintiff can show these requirements, a defendant has infringed a plaintiff's procedural due process rights if it failed to provide a "name-clearing hearing." *See Roth*, 408 U.S. at 573 n.12 (stating that, where a liberty interest is implicated, due process requires notice and a hearing to "provide the person an opportunity to clear his name"); *Tonkovich*, 159 F.3d at 526 (holding no constitutional violation may occur if a procedurally proper name-clearing hearing is provided). The purpose of a name-clearing hearing is not to determine whether the charges were an adequate reason for termination or whether a plaintiff should be reinstated to his position; instead, the purpose of the hearing is to allow a plaintiff to clear his name and show that the accusations were false. *See DeFries v. Town of Washington, Okla.*, 875 F. Supp. 756, 765 (W.D. Okla. 1995).

It is undisputed that Defendants did not provide Metcalf with a name-clearing hearing or any other formal process following his termination, despite a written request from Metcalf's attorney on the day of the termination.[6] Defendants argue in their motion for summary judgment that such a hearing was not required because Metcalf cannot show he was deprived of a liberty interest under

---

and that inability to obtain future employment, in the absence of a termination, is insufficient to give rise to protected liberty interest). The Court need not resolve this conflict because Plaintiff has raised a question of fact as to whether he was terminated incident to the alleged defamation. This is in contrast to *Stidham*, in which the plaintiff had voluntarily resigned after defamatory statements were made about him and then was unable to find future employment. *Id.*

[6] Metcalf was afforded the opportunity to speak during the public comments portion of every Grove City Council meeting. (*See* Metcalf Dep., Def.'s Ex. AA at 145-46.) This does not amount to any type of formal process. Even if it did, it would not rise to the level of a constitutionally adequate name-clearing hearing, which must provide a plaintiff with notice of the charges, an opportunity to confront and cross-examine witnesses, an impartial tribunal, and a statement of reasons for the decision. *See DeFries*, 875 F. Supp. at 765.

the established Tenth Circuit precedent.[7]  Thus, the outcome of this motion turns solely on whether Metcalf can establish the four-part test described above and not whether the process he received was adequate.  *Cf. DeFries*, 875 F. Supp. at 765 (determining that charges implicated a liberty interest and then analyzing whether adversarial proceeding provided to plaintiff actually provided him with a "meaningful opportunity" to clear his name).

A.      *First Element - Created and Disseminated Stigmatizing Statements*

As an initial matter, the Court must determine whether the statements made in the press, assuming such statements were created and disseminated by Defendants, impacted Metcalf's reputation or good name such that they were "sufficiently stigmatizing" to implicate a liberty interest.  It is clear from Metcalf's arguments and statement of facts that Metcalf's constitutional claim relates solely to publications regarding the pornography found on his computer and not to the later publications regarding misuse of city property and funds.  (*See* Plf.'s Resp. to Def.'s Mot. Summ. J. at ¶ 6 & 9.)  As a general rule, allegations involving immoral or unprofessional conduct are "sufficiently stigmatizing" to  impugn a person's good name, reputation, honor, or integrity.  *See McGhee v. Draper*, 564 F.2d 902, 911 (10th Cir. 1977) (school board minutes discussing, *inter alia*, pornographic materials sufficient to avoid directed verdict on issue of liberty interest); *Melton*, 928 F.2d at 933 n.1 (Logan, J., dissenting) (stating that charges are sufficiently stigmatizing if they involve "allegations of dishonesty, immorality, or unprofessional or illegal conduct," as opposed to charges of mere negligence, tardiness, or poor job performance, and listing Tenth Circuit cases).

---

[7]  To the extent Defendants also argue that such a hearing was not required because Metcalf was not entitled to it under their personnel handbook, the Court easily disposes of this argument.  A name-clearing hearing is a constitutional requirement that is imposed on an employer regardless of its internal policies.

Thus, as a matter of law, the Court finds that the statements and overall impression created regarding Metcalf's termination as a city employee were "sufficiently stigmatizing" to give rise to a liberty interest. *See Melton*, 928 F.2d at 927, 934 (majority discussing the issue of "sufficiently stigmatizing" as a question of law for the Court and dissent stating that "[i]n cases with undisputed facts, I agree with the majority that the court must decide whether the statements made were sufficiently stigmatizing to implicate a liberty interest.").[8]

This does not, however, end the inquiry as to the first element. Plaintiff must also establish that Defendants "created and disseminated" the allegedly false and defamatory impression. *See Melton*, 928 F.2d at 928 n.12. Defendants' argument is focused here. Defendants contend they cannot be held responsible for any stigmatization that may have occurred because neither Galletly nor any other Defendant "created and disseminated" the defamatory impression to the press. Specifically, Defendant argues that "[a]lthough the articles mention both pornography and City computers, there is no statement from Galletly attributing the material to Metcalf" and that "the only public disclosure of stigmatizing Metcalf was made by his own attorney." (Def.'s Mot. Summ. J. at 11, 14.) The only relevant Defendant with respect to this issue is Galletly, as he is the only individual who ever spoke to the press or was quoted by the press. Determining whether Galletly "created and disseminated" the false impression requires close analysis of the sequence of events and the precise statements made by the press, which are set forth in detail above.

In the initial publications occurring from June 2-17, 2004, which were prior to Metcalf's termination and were related to the pornography investigation, Galletly did not mention Metcalf's

---

[8] The parties have submitted the same news broadcasts and newspaper articles as their evidentiary record, and there is no factual dispute as to their content.

name.  As a summary, Galletly made the following relevant statements to the press during this initial time period:  (1) a criminal investigation would take place focusing on child pornography; (2) the City would not name the departments or personnel involved until the investigation is over; (3) someone using one computer visited pornographic sites and someone using the other possibly visited pornographic sites involving minors; (4) the investigation was prompted by a tip from a staff member; (4) a city employee informed Galletly that the files in two specific offices should be looked at; (5) it was verified by the police that pornography was viewed on both City computers;[9] (6) it had become an "administrative issue" at this point and, if warranted, the City would take action; (7) pornography had been viewed "without a doubt" and the Internet history provided investigators with detailed lists of web sites that allowed the City to "know the visits [were] deliberate" and not just pop-up ads; and (8) one of the computers was password protected and accessible only by one person but the other would be harder to narrow down.  (*See infra* at pp. 3-4 for exact quotes and article citations.)  Thus, as of June 17, 2004, the City had verified that pornography had been found but had not identified the computer users.[10]  The Court concludes that "creation and dissemination" had not occurred at this point in time because the "mere statement that there is an investigation does not violate a liberty interest when there actually is an investigation."  *Primas v. City of Oklahoma City*, 958 F.2d 1506, 1510 (10th Cir. 1992).  Further, Metcalf was not linked to the investigation in any

---

[9]  Prior to this statement, the police department had issued a statement that no child pornography was found and therefore no crime had been committed.

[10]  In the June 17, 2004 *Miami News-Record* article, the article did state that "one computer was in use at the Grove Civic Center, and the other at the Grove Emergency Management Department," thereby narrowing down the number of employees who could have possessed the computer containing the pornographic material.  However, the article states that these details were released "from the investigation" rather than from Galletly.  (*See* Def.'s Ex. U.)

way, so there was no target of the alleged defamatory statements.

Four days after Metcalf's termination, there was additional publicity during June 22-23, 2004. The first two news broadcasts, aired on June 22, 2004, reported that Gary Metcalf, Grove Emergency Services Director, had been fired "after officials found a city computer was apparently used to visit pornographic Web sites" and "after an investigation." This was the first time that Metcalf's name and termination were linked to the pornography investigation. Neither Galletly nor any other City official is mentioned or quoted in these first two broadcasts.[11] Instead, both broadcasts mention Metcalf's attorney, Winston Connor, as saying that Metcalf was fired and that Metcalf denies accessing inappropriate material. Galletly was first quoted, post-termination, in a June 23, 2004 newspaper article, stating that pornography is not protected speech on a work computer. In a second article of that date, Galletly was referenced in regard to a statement that the City was in the process of putting a computer policy in place when the allegations surfaced. Galletly's post-termination comments at this point in time could be viewed as implicitly confirming that Metcalf was fired for violating an Internet policy by having pornography on his work computer, although the publications do not indicate that Galletly was the original source of information that Metcalf was terminated or the reason for his termination.[12]

There was a third round of publicity approximately one month later that primarily focused on the internal audit and resulting financial investigation of Metcalf's activities. These articles also

---

[11]   The termination document itself merely states that Plaintiff was terminated "for the good of the service." There is no evidence that this document was made public. (Def.'s Ex. K.)

[12]   No deposition testimony in the record from Galletly, Metcalf, or any reporter clarifies who originally disclosed this information, so the articles themselves are the only evidence before the Court.

mentioned the reasons for Metcalf's termination and are therefore relied upon by Metcalf as part of the "pornography" publication evidence in this case.  Metcalf particularly focuses on one of these articles, which is dated August 5, 2005 and which ran in *The Tulsa World*.  This article states that "city officials fired emergency services chief Gary M. Metcalf *after they said* adult pornography was found on his computer at work."  (*See* Def's Ex. Y (emphasis added).)  This statement and others during this time period could also be viewed by a factfinder as the City's explicit statement or implicit confirmation that Metcalf was terminated for having adult pornography on his computer at work.

The Tenth Circuit's decision in *Melton* provides guidance in applying the facts of this case to the issue of whether Defendants are responsible for "creation and dissemination" of the defamatory impression  At issue in *Melton* were publicized reports that the plaintiff, a police officer, was accused of and being investigated for perjuring himself in an affidavit and at trial.  The court in *Melton* concluded that the defendant had not "created" the defamatory impression where: (1) the defendant was not alone responsible for the publication since the reporter who contacted the defendant already knew about the FBI's accusations and therefore the "original disclosure" did not come from the defendant; (2) the published stories themselves attributed disclosure of the defamatory reports to persons other than the defendant; and (3) the plaintiff was never charged with perjury by the defendant and the punitive action taken against the defendant had nothing to do with the perjury accusations.[13]

With respect to the first and second considerations, the record indicates that a combination

---

[13]   The court also considered whether the defendant's statements were true.  The Court will discuss this in relation to the second element.

of entities, rather than Galletly acting entirely alone, made the statements that created the overall defamatory impression. Galletly clearly publicized the pornography investigation, but the articles do not attribute Galletly with the "original disclosure" of Metcalf's termination or the reasons for the termination.[14]  Metcalf's attorney is the only person referenced in the first two post-termination articles. However, and most important to the Court's decision, there is evidence in the record that could be viewed as Galletly and the City confirming, either explicitly or implicitly, that pornography was the reason for Metcalf's termination in subsequent articles and statements. The evidence in this regard includes, *inter alia*, Galletly's statement four days following Metcalf's termination that pornography on a work computer was not protected speech, which arguably stamped the City's imprimatur on the reported reason for Metcalf's termination, and the statement in the August 5, 2004 article that "city officials fired emergency services chief Gary M. Metcalf after they said adult pornography was found on his computer at work."  The court in *Melton* addressed this type of situation:

> We must, therefore, conclude that the mere reporting of the defamatory accusations of a third party will not make governmental agencies or governmental officials liable for the deprivation of a protected liberty interest. *That conclusion does not hold, however, if the governmental entity overtly or impliedly adopts those defamatory accusations as the basis for punitive action against an employee.*

*Id.* at 931 (emphasis added).

Thus, the Court concludes that the case is distinguishable from *Melton* in that the City initially reported the fact of the pornography investigation, then reported the result that adult pornographic web sites were visited and that there was "no doubt" that such visits were

---

[14]   The Court notes that Defendants have not submitted any testimony of Galletly regarding whether and under what circumstances he disclosed the termination to the media but instead rely solely on the publications.

unintentional, then reported that any further actions taken would be internal personnel decisions, and then terminated Metcalf (but did not report the termination).  Subsequent to the termination, there is at the very least a disputed issue of fact as to whether the City either overtly or impliedly adopted the results of the pornography investigation as the reason for Metcalf's termination.

This case is more like the case of *McGhee v. Draper*, 564 F.2d 902 (10th Cir. 1977), cited in *Melton*, in which "it was clearly inferable that a significant reason for its decision was the board's adoption of the accusation the teacher was guilty of immoral conduct."  *Melton*, 928 F.2d at 931. In *Draper*, a teacher was publically accused by three students of immoral conduct and then her contract was not renewed for "unstated reasons" at the same meeting.  These meeting minutes were publically distributed.  Thereafter, the plaintiff and her attorney aggressively sought a meeting with the school board.  At the meeting, Draper herself and her attorney repeatedly questioned the board members about the reasons for her non-renewal and only then were such reasons stated.  Under these circumstances, in which the plaintiff and the defendant were to some extent jointly responsible, the court found a "fact question whether the board's actions *in effect* created and disseminated an allegedly false impression about the plaintiff."  *Id.* at 910.[15]

Although Defendants repeatedly point to the fact that Connor "first publicized" the fact of Metcalf's termination, this is not entirely conclusive from the record before the Court.  In any event, this is not determinative but is merely one consideration in determining whether Defendants can be liable for "creating and disseminating" the defamatory impression.  Defendants played at least some role in revealing, confirming, and/or adopting certain impressions in the mind of the public.  This

---

[15]   This case is distinguishable from *Draper* in that it was undisputed that the board initially published the fact of termination by virtue of the meeting minutes.

is therefore not a case in which the plaintiff alone was responsible for the publication. *See Derstein v. Kansas*, 915 F.2d 1410 (10th Cir. 1990) (no liberty interest violation where plaintiff himself revealed reason for termination to prospective employers); *Rich v. Secretary of the Army*, 735 F.2d 1220, 1227 (no liberty interest where plaintiff himself publicized his homosexuality and the reason for his discharge); *cf. Primas v. City of Oklahoma City*, 958 F.2d 1506, 1509 (10th Cir. 1992) (any defamation that had occurred was in a public court document and not made directly by the city official).  Nor is it a clear-cut case in which a news release was issued by the public official in direct connection with the termination.  *See, e.g., Johnson v. Rogers*, 621 F.2d 300, 306 (8th Cir. 1980). Instead, a substantial question of fact exists as to whether Defendants created and disseminated the defamatory impression.  *See Draper*, 564 F.2d at 910.

With respect to the third consideration of whether the punitive action taken against Metcalf clearly related to or stemmed from the alleged defamatory charges, this case is further distinguishable from *Melton*.  Although the termination document itself does not state a reason, Galletly indicated in the meeting on the day of termination that Metcalf was being terminated based on the results of the pornography investigation and his actions related thereto.  (*See* Def.'s Ex. J.) In contrast, in *Melton*, "the evidence [was] completely contrary to the inference that the unfounded accusations played any part in Mr. Melton's discipline."  *Id.*

In sum, the Court concludes that Metcalf's evidence is sufficient to reach a jury on the issue of whether Defendants in effect "created and disseminated" the defamatory impression at issue, either by explicit statements or implicit adoption of the previously reported incidents as the reason for his termination.  The Court concludes as a matter of law that the type of defamatory impression at issue, which link Metcalf's name to the finding of adult pornographic web sites on his computer,

are "sufficiently stigmatizing" to give rise to a liberty interest because they involve allegations of immoral or unprofessional conduct.

    B.  *Second Element - Falsity of Defamatory Impression*

   In *McGhee v. Draper*, 639 F.2d 639, 643 (10th Cir. 1981), the court held that the "truth or falsity of any charges made or legitimized by the school board's decision is not relevant to determining the existence of a procedural due process violation; it is relevant only in fashioning the appropriate remedy." Metcalf relies on this holding in his motion for summary judgment to argue that Metcalf has established this element as a matter of law merely by challenging the truthfulness of the impression created. However, since *Draper*, the Tenth Circuit has repeatedly stated that "falsity *is an element* of a public employee's liberty interest claim," *see, e.g., Melton*, 928 F.2d at 929 n.14 (emphasis added), indicating that a showing of falsity is necessary in determining the violation as well as fashioning the remedy. The court has indicated that the "dispositive question" as to the falsity element is whether a reasonable factfinder could conclude that the statements in the publication were false and whether a "reasonable reader" would believe from the content of the publications that the defendants had accused or terminated the plaintiff based on false allegations. *See id.* at 929. This indicates that merely raising a challenge to truthfulness is insufficient to satisfy the element as a matter of law for summary judgment. Instead, the question is whether a reasonable reader could believe Metcalf was fired based on false allegations. Thus, the Court rejects Metcalf's argument that he is entitled to summary judgment on the element of "falsity" merely by raising a challenge to the truthfulness.

   Defendants also move for summary judgment on the element of falsity, arguing that, even assuming they are responsible for "creating and disseminating" the statements, Metcalf has

presented no evidence that any statements they made were false.  Specifically, it is not disputed by Metcalf that there was a pornography investigation, that he was terminated, and that pornography was *found* on his computer, which is the extent of what was reported by the media.  Metcalf does not deny that pornography was *found* on his computer but denies only that he *intentionally viewed or accessed* the pornography on his computer.  Therefore, Defendants argue, a name-clearing hearing would have served no useful purpose because Metcalf admits the truthfulness of the only potentially stigmatizing charges that were *technically* reported by the media - that pornography was *found* on his computer.

Defendants' argument ignores the principle that the Court must be concerned with whether a "defamatory impression" was created, s*ee Melton*, 928 F.2d at 928 n.12, and that "whether a publication is defaming is not to be determined from a single sentence, but rather from the content of a complete statement," *see id.* at 929.  It is overly formalistic to conclude that no reasonable factfinder could find that a false impression about Metcalf was created by the media reports in this case, assuming it is believed that Metcalf never in fact intentionally viewed or accessed pornography on his work computer.  Metcalf contends in his deposition that another employee who had been accused of improper Internet use in the past had access to his computer, and that, if he did view any improper sites, it was unintentional and as a result of unwanted "pop-ups."  (Metcalf Dep., Def.'s Ex. AA at 82:15-84:8.)  Viewing the facts in their most favorable light, a reasonable jury could conclude that the overall impression created in the minds of the public was that Metcalf was terminated for viewing adult pornographic web sites at work and that such impression was false.  The articles' use of the words "found on his computer" rather than the words "accessed by Metcalf" or "viewed by Metcalf" is a distinction without a difference when one is considering the potential

21

defamatory impression made upon a reasonable reader, particularly when the "true" statements that do not technically implicate wrongdoing are made immediately following an employee's termination.

The Court's conclusion, that a false impression can be created by inferences drawn from unspoken statements or literally "true" statements, comports with case law. *See Melton,* 928 F.2d at 929 n.14 ("[A] literally true statement can, when considered in context, lead to false impressions which create liability for defamation."); *McGhee v. Draper*, 564 F.2d 902, 910 (10th Cir. 1977) (where a school board's letter and resolution stated no charges or findings and therefore was silent, but where board minutes released to the public focused on pornographic materials, "[t]he discharge against this immediate background raises a substantial question whether the board declining to re-employ had imposed a stigma"); *McGhee v. Draper*, 639 F.2d 639, 643 (10th Cir. 1981) ("Typically, when one's liberty interest is infringed upon by a discharge from employment, the termination . . will either explicitly state the stigmatizing factors or *implicitly ratify* some other stigmatizing allegations.") (emphasis added); *DeFries*, 875 F. Supp. 2d at 765 (statements to the effect that money entrusted to the plaintiff "didn't make it to the bank" can "reasonably be read" to say that the plaintiff stole the money).

With respect to falsity, the facts are again distinguishable from those present in *Melton*. In *Melton*, the court determined that it could not "be presumed a reasonable reader would believe from the content of the article that [the defendants] had accused [the plaintiff] of perjury." *Melton*, 928 F.2d at 929. Here, it could very likely be presumed from the articles that the City accused and terminated Metcalf for accessed and viewing the pornography, despite the fact that the article merely states that pornography was "found" on his computer. In sum, there is a "factual dispute between

22

[the City] and [Metcalf] which has some significant bearing on the employee's reputation" such that a name-clearing hearing could have had a meaningful impact on Metcalf and his ability to obtain future employment.  *See id.* at 926 (citing *Codd v. Velger*, 429 U.S. 624 (1977)).

C.   *Elements Three and Four:   Made in Course of Termination Proceedings/ Foreclosure of Future Employment Opportunities and Publication*

As explained above in footnote five, there is confusion surrounding whether foreclosure of future employment opportunities, divorced from a termination, may satisfy the third element.  It is not necessary to resolve the issue at this time because the Court concludes, based on the evidence in the record and the timing of the alleged defamatory statements, that Metcalf has submitted sufficient evidence to create a question of fact as to whether the defamatory impression was created in the course of termination proceedings.  The Court also concludes that Metcalf has created a question of fact as to whether the defamatory impression foreclosed future employment opportunities.  *Palmer v. City of Monticello*, 31 F.3d 1499, 1503 ("The plaintiff need not prove actual loss of a job opportunity; it is sufficient to prove termination based on a publicized false charge of sufficient opprobrium that would make the plaintiff an unlikely candidate for employment.").  The parties' jury instructions or trial brief should state their position on the proper wording of the third element and should cite any additional case law discussing same.

There does not appear to be any real dispute as to the fourth element of publication, based on the numerous articles and broadcasts in the record.  Defendants merely dispute that they were responsible for any of the relevant publications and whether any such publications were false, but the Court finds that material issues of fact preclude summary judgment on these questions.

## III.   Qualified Immunity of Individual Defendant Galletly

"Qualified immunity is designed to shield public officials from liability and ensure that

erroneous suits do not even go to trial." *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995). "To determine whether a plaintiff can overcome the qualified immunity defense, 'first we determine whether the plaintiff has asserted a violation of a constitutional or statutory right, and then we decide whether that right was clearly established such that a reasonable person in the defendant's position would have known that [his] conduct violated that right.'" *Roska ex. rel. Roska v. Peterson*, 328 F.3d 1230, 1239 (10th Cir. 2003). The Court has found that Metcalf has created a question of fact as to whether the conduct of Galletly and the City violated Metcalf's constitutional rights. Metcalf has therefore sufficiently asserted violation of a constitutional right.

In order to determine if Metcalf has carried his burden as to the second element, the Court must "determine whether the right was so clearly established that a reasonable person would have known that [his] conduct violated that right." *Allbright*, 51 F.3d at 1535. To be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point." *Id.* The touchstone of the inquiry is whether the official was on fair notice that the conduct was unlawful. *Roska*, 328 F.3d at 1248. Qualified immunity precludes imposition of liability for all but the "plainly incompetent" or those who knowingly violate the law. *Id.* at 1251.

The general right to a name-clearing hearing where a public employee's reputation or good name is at stake has been entrenched in United States Supreme Court and Tenth Circuit case law for over twenty years and is therefore "clearly established." *See, e.g., Melton*, 928 F.2d at 933 n.1 (Logan. J., dissenting) (listing over fifteen cases in Tenth Circuit involving the right to procedural due process where one's liberty interest is at stake). The right to a name-clearing hearing in

24

instances where a defamatory impression is created in the course of termination of a public employee is clearly a right of which a reasonable public employer should be aware. Even assuming he was not aware of the right, Galletly was expressly put on notice by Metcalf's attorney that Metcalf asserted a constitutional right to a "name-clearing hearing" on the very day of Metcalf's termination. (*See* Plf.'s Ex. 4.) Nonetheless, Galletly did not seek any legal or other advice. (*See* Galletly Dep., Plf.'s Ex. 2 at 106:1-4. ("I probably did not seek the advice of an attorney before I acted.").) Instead, he decided not provide a name-clearing hearing because he "did not feel [he] could," based on "the statutes in the personnel manual." (*See* Galletly Dep., Plf.'s Ex. 2 at 106:7-24.)

Galletly argues that the right, even if generally established, was not clearly established in this situation because he did not make any *literally* false statements or directly attribute any conduct to Metcalf in the media. Under these circumstances, Galletly argues, a reasonable official would not have known that his conduct was in violation of any constitutional rights. (*See* Def.'s Mot. for Summ. J. at 16.)

In *Chapman v. Nichols*, 989 F.2d 393, 397 (10th Cir. 1993), the Court considered a similar argument. The defendant argued that, although a general right at issue was clearly established, no case had held that a search conducted under the precise circumstances presented in that case was unlawful. The court applied the standard of whether the unlawful action was "objectively reasonable when assessed in light of legal rules that were clearly established when the action was taken." *Id.* The court noted that "[t]his is not to say that every action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Id.*

The Tenth Circuit's decision in *McGhee v. Draper*, 564 F.2d 902 (10th Cir. 1977), convinces the Court that the right was clearly established under the specific circumstances presented. In *Draper*, as here, the defendant did not come forward with a reason for termination; instead, it had publicized potentially stigmatizing statements and then terminated the plaintiff. The plaintiff had, to a certain extent, injected the reasons for the termination into the public realm. *See id.* n.6. The court held this to be sufficient to raise a fact question as to whether the defendant was "in effect" responsible for creation and dissemination. *Id.* at 910. Further, in the *Melton* case, the court specifically noted that where a defendant adopts or ratifies a defamatory reason for termination of a public employee, the right to a name-clearing hearing arises. *Melton*, 928 F.2d at 931. The Court concludes that the contours of the constitutional right to a name-clearing hearing in this instance were such that Galletly had fair notice that his conduct in failing to provide a hearing was in violation of the law. This conclusion is supported by the undisputed fact that Galletly did not meaningfully investigate his constitutional obligations as a public employer, despite Metcalf's timely and express invocation of the right. Based on the letter in the record requesting the name-clearing hearing, Galletly's deposition testimony regarding his reasons for failing to provide the hearing, and the fact that no hearing was provided, the Court concludes there are no material facts in dispute. Galletly is not entitled to qualified immunity as a matter of law. *See Chapman*, 989 F.2d at 398 (stating that the "objective reasonableness" of a public official's conduct is one for the Court, not a jury, where the material facts surrounding the decision are not in dispute).

## IV.    Qualified Immunity of Other Defendants

Defendants assert that the City Council Defendants are entitled to qualified immunity because Plaintiff has not shown that they had authority to provide the name-clearing hearing that

would have rectified the alleged violation.[16]  In response, Plaintiff argues that the City Council Defendants took an oath that they would support, defend, and obey the Constitution of the United States.  *See* OKLA. STAT. tit. 11, § 8-103; Oklahoma Constitution Article XV, § 1.  Plaintiff then cites the Oklahoma statutory scheme governing the powers vested in city councils and argues that such statutes authorized the conduct at issue.

Under Oklahoma law, a city council is vested with "[a]ll powers of a statutory council-manager city."  OKLA. STAT. tit. 11, § 10-106.  For example, a city council may "[i]nquire into the conduct of any office, department or agency of the city, and *investigate municipal affairs, or authorize and provide for such inquiries.*"  *Id.* (emphasis added).  Oklahoma law, however, expressly prohibits a city council from "[p]articipat[ing] *in any manner* in the appointment or removal of officers and employees of the city, except as provided by law; or appointing or removing city employees except through the city manager."  *Id.* at § 10-107.

Thus, if Metcalf asked the City Council to reinstate him, this was a prohibited act under Oklahoma law.  If Metcalf merely requested a name-clearing hearing, the sole purpose of the hearing would have been to allow him to put on evidence that he did not in fact access adult pornography at work.  Such a hearing would be an "investigation" or "inquiry" into municipal affairs, which are allowed under the statutory scheme.

The facts in the record are that "I [Metcalf] asked each council member for a name-clearing hearing - for them to make a decision on a name-clearing hearing."  (*See* Metcalf Dep., Def.'s Ex. AA at 144:2-5; Plf.'s Mot. for Partial Summ. J. at ¶ 6.)  These requests were in the form of letters

---

[16]   The City Council Defendants were members of the Grove City Council that did not support a name-clearing hearing.  Metcalf did not sue councilor Charles Rowe because Metcalf believed that Rowe supported his right to receive such a hearing.

sent to the City Council Defendants' homes.  (Metcalf Dep., Def.'s Ex. AA at 142:11-16.)  The letters themselves are not in the record, although they were requested by defense counsel during Metcalf's deposition.  (*Id.* at 142:17-21.)  There are no facts in the record disputing that the letters were received or that the letters requested a name-clearing hearing.  Thus, the undisputed facts in the record are that Plaintiff requested a name-clearing hearing, that such hearing was authorized by Oklahoma law, and that no hearing was provided.

For the reasons explained above with respect to Defendant Galletly, the Court concludes that the contours of the constitutional right to a name-clearing hearing in this instance were such that the City Council Defendants had fair notice that their conduct in failing to provide the requested hearing was in violation of the law.  The Court finds that there are no material facts in dispute, and the City Council Defendants are not entitled to qualified immunity as a matter of law.  *See Chapman*, 989 F.2d at 398 (stating that the "objective reasonableness" of a public official's conduct is one for the Court, not a jury, where the material facts surrounding the decision are not in dispute).

With respect to Defendant Mativy, there is no evidence in the record that she, as the Assistant City Manager, had any authority whatsoever to cure the alleged constitutional violation by providing a hearing.  Nor is there any evidence in the record indicating that she played a significant role in the decision-making process to fail to provide the hearing.  Instead, the only evidence is that she was present in the room when the termination decision was made.  (*See id.* at 141.)  The Court therefore concludes that she did not make any decisions or take any actions that potentially violated Metcalf's clearly established constitutional rights and that she is entitled to qualified immunity.

## V.      Legislative Immunity of City Council Defendants

28

Defendants also argue that the City Council Defendants are entitled to absolute legislative immunity because any decisions they made were purely legislative acts. (*See* Def.'s Supp. Brief in Support of Mot. for Summ. J.) As an initial matter, for the reasons explained above in Part IV, the Court concludes that Metcalf requested a name-clearing hearing and that the City Council Defendants had the authority to vote to provide him with such a hearing. The Court views the decision of whether or not to provide him with a hearing as the relevant action by the City Council Defendants.[17] There does not appear to have been any official decision or vote made by the City Council Defendants; instead, the failure was to act on the request at all.

Local legislators are entitled to absolute immunity for their legislative acts. *Kamplain v. Curry County Board of Commisioners*, 159 F.3d 1248, 1250 (10th Cir. 1998). In order to determine whether legislators should be cloaked in legislative immunity, the Court looks to the "function" that the City Council Defendants were performing when the actions at issue took place. *Id.* The essentials of the legislative function are the "determination of the legislative policy and its formulation and promulgation as a defined and binding rule of conduct." *Id.* "Legislation looks to the future and changes existing conditions by making a new rule, to be applied thereafter to all or some part of those subject to its power." *Id.* (quotation and citation omitted). At its core, "the legislative function involves determining, formulating, and making policy." *Id.* Neither the fact that

_____

[17]  Because they argue the City Council Defendants did not have authority to provide the hearing, Defendants frame the issue as the decision whether or not to terminate Galletly for failing to provide a hearing. However, it is clear that Metcalf does not seek to hold the City Council Defendants liable for failing to terminate Metcalf; he seeks to hold them liable for failing to provide him with the requested hearing. If and to the extent other decisions made by the City Council Defendants arise at trial, the Court will consider whether immunity attaches to such decisions at that time.

a vote is involved, nor the fact that the actions are taken at a legislative meeting, necessarily indicate that the action was legislative in nature. *Id.* at 1251-52.

Here, the Court concludes that the failure of the City Council Defendants to take any action on Metcalf's request for a name-clearing hearing or to provide a name-clearing hearing was administrative rather than legislative in nature. First, the decision impacted only Metcalf and not the general public or even a class of citizens. Although this is not determinative in the Tenth Circuit, *see id.* at 1251, it is instructive. Second, the decision to effectively deny a name-clearing hearing to Metcalf "did not concern the enactment or promulgation of public policy." *Id.* at 1252. Although Defendants try to argue that such a decision would have promulgated the general public policy of providing name-clearing hearings, this argument is unavailing in that a person has a constitutional right to a name-clearing hearing. A local legislature could not enact a general policy against holding such hearings; it could only decide whether one was warranted on a case-by-case basis. Finally, if the City Council would have voted to provide the hearing, such proceeding would have been legislative in nature. The proceeding would have involved notice to Metcalf, an opportunity to cross-examine his accusers, and an opportunity to clear his name. This proceeding would not have promulgated policy or resulted in any legislative acts; it would have been more "judicial or adjudicatory" in nature. *See Kamplain*, 159 F.3d at 1252. The Court concludes that the decision to fail to take any action on Metcalf's request was not a legislative act and that the City Council Defendants are not entitled to absolute legislative immunity.

## VI.   State Law Claims

Metcalf's state law claims asserted against official actors were filed in this case prematurely, in violation of the Oklahoma Governmental Tort Claims Act ("GTCA"), OKLA. STAT. tit. 51, § 151,

30

*et seq.*   The GTCA "prohibits a claimant from initiating a tort action" until the expiration of a 90-day period allowed for a governmental entity to consider the claim and either approve or deny it. *See Hathaway v. State of Oklahoma*, 49 P.3d 740, 743 (Okla. 2002).  Metcalf filed notice with the City on March 1, 2005, and filed the Complaint the following day.  The City's insurer acknowledged receipt of the claim by letter on March 4, 2005.  (*See* Plf.'s Ex. 9.)

The Complaint states an intention to amend the Complaint to add the state law claims at the appropriate time, but such amendment was never made.  Thus, the claims are subject to dismissal. *Id.*  Normally, such a dismissal is without prejudice, and a claimant may refile the action after the 90-day waiting period expires but before the 180-day limitation expires.  *Id.* at 743 & n.12 (citing statute providing for 180-day limitation period after claim is denied).  Metcalf concedes that more than 180 days has expired since the City denied the claim. However, pursuant to OKLA. STAT. tit. 12, § 100, a party has up to one year from dismissal to refile an action if dismissal was for a reason other than on the merits so long as the claim was initially timely commenced.  *See Cruse v. Bd. of Cty. Commisioners*, 910 P.2d 990, 1004-05 (Okla. 1995).  A "premature" claim is deemed timely commenced for purposes of OKLA. STAT. tit. 12, § 100.  *See Matter of Estate v. Speake*, 743 P.2d 648, 650 (Okla. 1987).  Accordingly, if the Court dismissed the state law claims, they would be subject to immediate refiling.

Defendants have been aware of the three state law claims asserted - slander, intentional infliction of emotional distress ("IIED"), and tortious interference with business relations ("TIBR") - since the inception of the case.  Defendants have asserted affirmative defenses to such claims, conducted discovery as to such claims, and moved for summary judgment on the substantive elements of the claims.

31

In the interest of judicial efficiency and the lack of prejudice to Defendants, the Court hereby allows Defendants to file an Amended Complaint asserting those three, and only those three, state law causes of action no later than two days from the date of this Order.  Such Amended Complaint shall be deemed timely and in compliance with the GTCA's requirements in all respects.  Because Defendants have fully briefed these issues and urged the Court to rule on the merits, the Court will proceed to substantively consider the claims and such rulings shall be deemed final, despite that the Amended Complaint will be filed subsequent to entry of this Order.

A.     *Slander*

In order to recover for defamation or slander, a private figure must prove (1) a false and defamatory statement, (2) an unprivileged publication to a third party, (3) fault amounting at least to negligence on the part of the publisher; and (4) either the actionability of the statement irrespective of special damage, or the existence of special damage caused by the publication. *Mitchell v. Griffin Television*, 60 P.3d 1058, 1061 (Okla. Ct. App. 2002).  Defendants argue in their motion that "Plaintiff has no evidence that a false and defamatory statement was communicated by Galletly to any third party."  Metcalf concedes that he does not have an admission from Galletly that he made false statements to the media.  Metcalf relies instead on the publications themselves and argues that a jury could conclude that Galletly was, in fact, the source of certain defamatory statements and/or the defamatory impression.  Plaintiff again relies heavily on the August 5, 2004 *Tulsa World* article which reported that "city officials fired emergency services chief Gary M. Metcalf after they said pornography was found on his computers at work."

The Court agrees with Metcalf that a jury could conclude, from this statement and the articles as a whole, that Galletly explicitly stated the reasons for the termination and/or implicitly adopted

32

the reasons for termination.  Again, the Court concludes that even literally true statements (Metcalf was terminated and pornography was found on his computer) could function to create a false defamatory impression (Metcalf viewed and accessed pornography on his computer at work, which is why it was found there and why he was terminated).  *See Melton*, 928 F.2d at n.14 (noting that, in the context of common law defamation actions, "courts have recognized that a literally true statement, when considered in context, can lead to false impressions which create liability for defamation" and that "the distinction between those reports which are actionable and those which are not is what the reporter intends and what the average reader perceives from the report").  Further, Plaintiff has claimed that the statements made regarding the financial investigation are also false and defamatory, arguing that he was authorized to use City equipment for his e-bay business.  These comments are relevant to the slander claim because there is no requirement that the comments be tied to the termination proceedings.

The Court therefore finds that a question of fact exists as to the slander claim.  Because the parties have, at this point, submitted very little authority on a slander claim under Oklahoma law, the parties are ordered to include in their jury instructions or trial briefs further case citations that will assist the Court in preparing jury instructions specific to the facts of this case, which, at least to some extent, may involve true statements that created a false impression.

B.    *IIED*

Under Oklahoma law, there are four elements to an intentional infliction of emotional distress claim: (1) the tortfeasor acted intentionally or recklessly; (2) the tortfeasor's conduct was extreme and outrageous; (3) the plaintiff actually experienced emotional distress; and (4) the emotional distress was severe.  *Starr v. Pearle Vision, Inc.*, 54 F.3d 1548, 1558 (10th Cir. 1995).

Liability for this tort does not extend to mere insults, indignities, threats, or occasional acts that are definitely inconsiderate and unkind. *Id.* "Instead, the defendant's conduct must be 'beyond all possible bounds of decency' or 'utterly intolerable in a civilized community.'" *Id.* Nothing short of extraordinary transgressions of the bounds of civility will give rise to liability for intentional infliction of emotional distress. *Id.*

Metcalf's claim for intentional infliction of emotional distress is based on: (1) Galletly's treatment of him during the tenure of his employment, beginning with Galletly's statement that he did not need Metcalf's department (Metcalf Dep., Def.'s Ex. AA at 152:4-20); (2) an incident in which Defendant Helms "slammed the door and yelled and screamed and turned red" (*id.* at 152:1, 74-75); (3) Galletly's interrogation of Metcalf during the June 18, 2004 termination meeting despite the fact that Metcalf was suffering from physical ailments and taking medication (Plf.'s Resp. to Def.'s Mot. for Summ. J. at 16); and (4) Galletly's summary termination of Metcalf despite Metcalf's plea to speak with his attorney (*id.*). The Court concludes that these incidents, considered individually and as a collective whole, are insufficient to show the second element requiring that the conduct be so severe and outrageous to be beyond all bounds of decency or utterly intolerable in a civilized community. Specifically, the workplace incidents described by Metcalf are mere trivialities that a reasonable person must be expected to endure in a high-pressure job such as emergency management director. The transcript of the termination meeting does not reveal anything that, in the Court's view, could be considered extreme or outrageous conduct of any kind by Galletly. Galletly's remarks during the meeting, but for their unpleasant subject matter, were professional, reasoned, and did not evidence anything a reasonable person being terminated is not expected to endure.

C.     *TIBR*

In order to state a claim for TIBR, a plaintiff must show:  (1) that he or she had a business or contractual right that was interfered with; (2) that the interference was malicious and wrongful, and that such interference was neither justified, privileged nor excusable; and (3) that damage was proximately sustained as a result of the complained-of interference.  *Mac Adjustment, Inc. v. Property Loss Research Bureau*, 595 P.2d 427, 428 (Okla. 1979).   Tortious interference with business relations involves the loss of an existing "property right," such as a contract or a customer. *See Overbeck v Quaker Life Ins. Co.*, 757 P.2d 846, 847 (Okla. 1984).  A typical case involves a defendant making malicious, derogatory statements or taking specific actions intentionally intended to ruin a competitor's contractual relationship with customers or to ruin a competitor's business reputation.  *See id.* at n.2 (citing Oklahoma cases).   The common-law basis for the tort is that "[a] person has a right to carry on and prosecute a lawful business in which he is engaged without unlawful molestation or interference from any person," and any "malicious interference with the right to carry on a legitimate business is an actionable wrong."  *Stebbin v. Edwards*, 224 P. 714 (Okla. 1924); *Chilton v. Oklahoma Tire & Supply Co.*, 67 P.2d 27 (Okla. 1937).

Metcalf's claim is that Defendants intentionally set out to "prevent him from obtaining comparable employment in his field" and to destroy his "photography business."  Metcalf is a professional photographer and had owned a photography studio in Grove prior to being made a full-time employee as the emergency services director. (Metcalf Dep., Def's Ex. AA at 26-27.)  Metcalf did not own the studio at the time of any of the alleged defamatory statements.  Following his termination, Metcalf opened Metcalf's Photographic Images in Miami, Oklahoma, in January 2005. (*Id.* at 28:8-29:2)  Metcalf claims that he had to close this studio due to the damage to his reputation,

including statements that he was a "pornographer" and "embezzler."

The Court concludes that Metcalf's claims for TIBR fail as a matter of law because he has failed to show intentional interference with an existing property right or contract at the time of the alleged derogatory statements.  In order for Defendants to have "intentionally interfered" with a contract or business relationship, such relationship had to exist at the time the statements were made. Under Oklahoma law, the tort of TIBR is not synonymous with the tort of interference with prospective economic advantage.  *See Overbeck*, 757 P.2d at 847-48.  Even if the Court construed the claim as one for interference with prospective economic advantage, which it declines to do, Plaintiff has not come forward, at this stage of the proceedings, with sufficient evidence of a "reasonable expectation of profit" or of specific damages to survive a motion for summary judgment.  Instead, Metcalf has presented only conclusory allegations that the media accusations were the cause of a decline in his photography business.[18]

## VI.    Conclusion

For the reasons stated, Defendants' Motion for Summary Judgment (Docket No. 29) is GRANTED IN PART AND DENIED IN PART.  Defendants' Motion for Summary Judgment is DENIED with respect to Metcalf's constitutional claim; DENIED with respect to the qualified immunity of Galletly; DENIED with respect to the qualified immunity of the City Council Defendants; GRANTED with respect to the qualified immunity of Mativy; DENIED with respect to Metcalf's claim for slander; and GRANTED with respect to Metcalf's claims for IIED and TIBR.

---

[18]   With respect to his ability to find employment in the emergency services field, the Court notes that Metcalf is currently employed as the part-time emergency management director for Delaware County, Oklahoma.  (Metcalf Dep., Def's Ex. AA at 29-31.)  In any event, Metcalf has not showed an existing job or other property right in any employment with which Defendants could have interfered.

Plaintiff's Motion for Partial Summary Judgment (Docket No. 31) is DENIED.

The parties are ORDERED, in their jury instructions or trial briefs, to submit additional arguments and authority on the issues of the third element of the constitutional claim and the common-law slander claim.

Metcalf is ORDERED to file an Amended Complaint no later than two days from the date of this Order, asserting only the three state law claims described in the original Complaint.  Such claims shall be deemed timely asserted and answered.

**IT IS SO ORDERED this 7th day of MARCH, 2006.**

**TERENCE KERN**
**UNITED STATES DISTRICT JUDGE**